1

2

3

4

5

6

7

8          UNITED STATES DISTRICT COURT
         WESTERN DISTRICT OF WASHINGTON
9                   AT TACOMA

10   VERONICA BIEHNER, a single person,          CASE NO. 13-5491 RJB

11                Plaintiff,                      ORDER ON MOTION FOR
                                                 SUMMARY JUDGMENT
12        v.

13   DEPARTMENT OF SOCIAL AND
     HEALTH SERVICES, an agency of the
14   State of Washington, KATE ORLANDO
     and "JOHN DOE" ORLANDO and their
15   marital community, DAWN
     FLAMMANG and "JOHN DOE"
16   FLAMMAND and their marital
     community,
17
                 Defendants.
18

19
            This matter comes before the Court on Defendants' Motion for Summary Judgment. Dkt.
20
     23.  The Court has considered the pleadings filed in support of and in opposition to the motion
21
     and the file herein.
22
            On June 20, 2013, Plaintiff Veronica Biehner filed this case alleging that Defendants
23
     breached their duty to provide all material information to the state court in dependency
24

ORDER ON MOTION FOR SUMMARY
JUDGMENT- 1

proceedings concerning her son, they acted recklessly in pursuing a dependency when they were aware of an "extensive history of unfounded allegations" based on her son's "history of false allegations," and violated her constitutional rights.  Dkt. 1, at 4.  Plaintiff's son, a minor, will be referred to in this order as "Z" in accord with Local Rule W.D. Wash. 5.2(a)(2).

Defendants now move for summary dismissal of all claims.  Dkt. 23.  For the reasons set forth below, Defendants' motion should be granted.

## I.      FACTS

On May 3, 2012, the state's Department of Social and Health Services ("DSHS") filed a Dependency Petition regarding Z in Pierce County, Washington Superior Court, Juvenile Court Division.  *Dependency of:* Z, D.O.B. 2/11/99,  Pierce County, Washington Juvenile Court number 12-7-00964-7; filed in this case at Dkt. 26, at 12-17.  The allegation of dependency was based on the following:

1. Veronica Biehner is the mother of Z.  Michael Hurd is the presumed father of Z.  He is listed on Z's birth certificate.
2. Z has previously been placed in foster care from 11-6-09 to 12-17-10 and was dependent from 2-23-10 until 6-20-11.  Z was previously placed into care due to physical abuse by his mother.  His mother also yelled, used profanity towards him and withheld his dinner as a means of punishment.
3. During the previous dependency, Michael Hurd, Z's father, did not engage in any services and indicated that he is not a placement resource for Z.  Mr. Hurd did not maintain contact with the department and only visited with Z sporadically.
4. On 3-22-12 [Child Protective Services ("CPS")] received a referral from Z's school counselor indicating that Z is reporting physical abuse by his mother as well as neglect.  Since Z started school this year his mother has told the school the Z is a liar and that she can't trust him.  Z indicates that he does not have food for lunch.
5. On 3-22-12 the school reports that a month prior the mother and Z got into a conflict and she kicked him out of the car.  Z walked back to his doctor's office and mother called the police.  The police intervened and had Z return to the car.
6. On 3-22-12 the school reported that Z is on an [Individual Education Plan ("IEP")] and is in special education.  The teacher reported the Z came to school with a small bruise on his face and he reported that his mother punched

him.  He said that he has had the worst week and on Tuesday (3-13-12) he and his mother got into a fight about cleaning the bathroom.  He indicated that she tried to punch him and missed and she punched him again and hit him in the face with a half fist using her knuckles.

7.  On 3-22-12 Z reported that he recorded the incident and mother screaming at him on his watch and mother took his watch and threw it away.  During the argument she also grabbed him on his arm and left red marks.

8.  On 3-22-12 Z reported that his mother has tried to kick him down the stairs and he is not allowed to leave the home outside of school time.  He has to stay in his room and does not get dinner.  The mother will not let him make his own lunch and on this date he had a bag of dried top ramen for lunch.

9.  On 3-22-12 Z indicates that he prefers foster care to being with his mother.  Z said his step father is always at work when these incidents occur and he is not able to be protective.

10.  On 3-23-12 CPS went to school and interviewed Z.  He indicated that his mother has hit, punched, and kicked him.  He indicates that his mother punishes him if he does not clean well enough and that she kicks him out of the home if she is mad at him.

11.  On 3-26-12 the social worker attempted to schedule a meeting with mother.  Mother was combative over the phone, refused to meet with the worker, indicated the worker could not come to her home and indicated that Z is a liar.

12.  On 4-3-12 after numerous attempts to contact mother and engage her in services the social worker was able to reach mother by phone.  Mother refused to provide any collateral information to the social worker but did agree to participate in voluntary services.  Mother did not show for her scheduled meeting with the voluntary services worker and the department continues to have concerns about physical abuse of Z.

13.  On 4-10-12 the social worker went to mother's home.  The step father was home and said that Z does not misbehave when he is at the home.  He indicates that he has seen mother yell at Z and that Z yells at mother.  He indicates that due to his work schedule he rarely sees Z when he is at home.

14.  On 4-30-12 Z was interviewed again at school.  He continues to disclose physical abuse by his mother.  He indicates that it is ongoing and that he is not able to stop her.  Z indicated that on Saturday he did not clean the bathroom to mother's standards and she pushed him into the tub, grabbed him by the back of his shirt and hurt him.

15.  On 4-30-12 Z reported that he and his mother are having to move out of the step father's home due to marital issues.  He does not know where they are going to live but there will no longer be any protective adult in the home to ensure Z is safe.

16.  Mother has a founded referral from 2009 for physical abuse.  Mother has been the subject of 10 CPS referrals alleging physical abuse and neglect of Z.

17.  Michael Hurd has not provided any ongoing support to Z and is not a resource for him.

1      18. The following services have been offered during the previous dependency to
        prevent out of home placement:  voluntary services, parenting and anger
2          management assessment, in home counseling services, and FAST.

    19. On 5-1-12 Z's mother was contacted by CPS to obtain his medication.  His
3          mother said, "I'm not giving you jack shit" and hung up on the CPS
        supervisor.  Mother was asked three times to provide Z's medication and
4          refused.

    20. On 5-1-12 Z's mother came into the DCFS office and was yelling and
5          inappropriate in the lobby.  Mother was asked to leave several times and she
        refused.  Law enforcement was called and they issued a 30 day no contact for
6          mother and the DSHS building.  Mother cannot enter the building for 30 days
        for any reason.
7      21. On 5-1-12 mother called the Area Administrator's secretary.  Mother was
        belligerent, verbally abusive, and inappropriate.  Mother made many
8          derogatory comments about the CPS supervisor and was unable to de-escalate
        herself.
9      22. On 5-1-12 Z's mental health provider, Greater lakes, was contacted.  Dr. Poe,
        who treats Z, indicated that he has been tapering Z off his lithium and the only
10         other medication Z is on was prescribed through a paid clinical trial that
        mother is participating in and Dr. Poe is not in support of Z's taking the
11         clinical trial drug.

12  Dkt. 26, at 13-15.   The petition was submitted by Defendant Kate Orlando.  Dkt. 26, at 17.

13      A shelter care hearing was held and an order entered on May 18, 2012.  Dkt. 26-1, at 1-9.

14  Plaintiff was represented by counsel at the hearing.  Dkt. 26-1, at 1.  Plaintiff contested having Z

15  removed from her care.  *Id.*  The court issued an order and stated that it "did not make a finding

16  of reasonable efforts, but the family volatility is so great that the child shall remain in shelter care

17  until in-home services can be put in place."  Dkt. 26-1, at 3.  The court ordered Z be placed in

18  foster care "until in-home services can be put in place."  Dkt. 26-1, at 5.  On July 17, 2012, the

19  state moved for dismissal of the petition, because dependency had not been established.  Dkt. 26-

20  1, at 11.

21      About eight months later, on March 4, 2013, the state filed a Child in Need of Services

22  ("CHINS") Petition in regard to Z.  *In the Interest of Z, D.O.B. 2/11/99*, Pierce County,

23  Washington Superior Court, Juvenile Court Division number 13-7-00591-7; filed in this case at

24

ORDER ON MOTION FOR SUMMARY
JUDGMENT- 4

Dkt. 26-2, at 1-3.  This petition was also filed by Defendant Kate Orlando.  Dkt. 26-2, at 3.  A

hearing on the CHINS petition was held.  Dkt. 24.  Z was placed in foster care and Z's maternal

grandmother's home was going to be assessed as a relative placement.  Dkt. 25.

On March 14, 2013, the state filed a Dependency Petition in regard to Z.  *Dependency of*

*Z, D.O.B. 2/11/99*, Pierce County, Washington Superior Court, Juvenile Court Division number

13-7-00675-1; filed in this case at Dkt. 26-2, at 5-11.  This petition was also submitted by Ms.

Orlando.  Dkt. 26-2, at 11.  The allegation of dependency was based on the following:

1.  Veronica Biehner is the mother of Z.  Michael Hurd is the presumed father of
    Z.  He is listed on Z's birth certificate.
2.  Z has previously been placed in foster care via dependency action twice
    previously (11-6-09 to 12-17-10 and was dependent from 2-23-10 until 6-20-
    11, and again 5-1-12 to 5-30-12 via shelter care).  Z is currently in care via a
    CHINS petition that was filed on 3-4-12 with a CHINS contested fact-finding
    hearing currently scheduled for 3-15-12.  DSHS intends on withdrawing the
    CHINS petition as a result of the filing of this dependency petition.
3.  Z has reported to CPS that the level of conflict in the home with his mother
    has increased significantly over several months.  This conflict led on one
    occasion to charges being filed against Z for an alleged assault against Ms.
    Biehner.  The conflicts have led to over a dozen police contacts initiated by
    the mother, Z, or other concerned persons.
4.  At the CHINS hearing on 3-13-13, Ms. Biehner used vulgar language to
    describe an Assistant Attorney General in the midst of leaving the courtroom
    (she said "shut the fuck up you mother fucking cunt").  The Court directly
    addressed Ms. Biehner and advised her of the need to maintain proper
    behavior and decorum in the courtroom.  Ms. Biehner did not appear receptive
    to the Court's direction.  Ms. Biehner had also stated under her breath in open
    court while seated at counsel table at the Assistant Attorney General "go to
    hell."
5.  Ms. Biehner appears to be unable to control her anger towards department
    employees and law enforcement and has exhibited a lack of willingness to
    curtail such behaviors even in open court when directed by the
    Judge/Commissioner.
6.  DSHS filed the CHINS in an effort to attempt to engage the family in conflict-
    resolution given its increasing concerns regarding Z's safety in the family
    home given the number of law enforcement contacts and the mother's safety
    given the alleged assault by Z against his mother.
7.  Ms. Biehner has made it abundantly clear in open court (for the CHINS and in
    the [At Risk Youth Petition ("ARY")]) that she has no desire nor intention in

engaging with DSHS and thus the voluntary, out-of-home, conflict-resolution option of the CHINS does not continue to be a viable one.

Dkt. 26-2, at 6-7.  The petition then goes on to discuss multiple law enforcement reports of responding to the family's home.  Dkt. 26-2, at 7-10.  These reports included allegations of both Plaintiff and Z physically abusing one another and Plaintiff locking Z out of the house for extended periods in January, February, and March of 2013.  Dkt. 26-2, at 7-9.  Law enforcement also reported that it also responded to a call that Z was threatening to kill himself.  Dkt. 26-2, at 9.  The petition further provided that "[s]ince 2008, the Department has received 25 intakes, including allegations of physical abuse/neglect as well as Ms. Biehner calling in to request family reconciliation services ("FRS")."  Dkt. 26-2, at 10.

On March 25, 2013, Z's foster home contacted Defendant Dawn Flammang, who was a Department of Children and Family Services ("DCFS") social worker who was assigned to Z's case.  Dkt. 25, at 3.  The foster home stated that Z was to be removed immediately.  Dkt. 25, at 3.  Ms. Flammang was able to get them to agree to keep him until the March 29, 2013 shelter care hearing.  Dkt. 25, at 3.

On March 27, 2013, Ms. Flammang was notified that Z had come home from school with a fever, so his foster parent canceled his mental health appointment.  Dkt. 25, at 3.

On Friday, March 29, 2013, a shelter care hearing was held.  Dkt. 26-2, at 13.  Plaintiff contested having Z removed from her care.  Dkt. 26-2, at 13.  Plaintiff was represented by counsel, and testified at the hearing.  *Id.* and Dkt. 24, at 3.

At 4:35p.m., while Ms. Flammang was sitting outside the courtroom with Z and his grandmother, the state's attorney told them that the court had denied placement with Z's maternal grandmother and that Z would need to go back into foster care.  Dkt. 25, at 3.  The DCFS placement desk was notified about ten minutes later.  Dkt. 25, at 3.  Z's prior foster family

ORDER ON MOTION FOR SUMMARY
JUDGMENT- 6

1  was unavailable, so Z and Ms. Flammang went to the DSHS office.  Dkt. 25, at 4.  No placement

2  could be found in Pierce County.  *Id*.  Around 7:15 p.m., a placement was found in Snohomish

3  County, and Ms. Flammang took him up there, arriving around 10:00 p.m.  *Id*.

4        On April 1, 2013 around 7:15 a.m., Ms. Flammang emailed Z's school and informed

5  them that Z would not be in school that day and indicated that further information would follow.

6  Dkt. 25, at 4.  Ms. Flammang also emailed Z's principal later that day.  *Id*.  Later that day, staff

7  from Z's group home contacted Ms. Flammang and notified her that Z was sick.  *Id*.  Z requested

8  permission to be seen by a doctor.  *Id*.  Z's maternal grandmother took him to the Everett Clinic

9  in Smokey Point.  *Id.*

10        On April 2nd, 3rd, and 4th, Ms. Flammang was in contact with Z's school, mental health

11  provider, and therapy provider, informed them that Z would not be attending appointments,

12  discussed his current living situation, and indicated that more information would be forthcoming.

13  Dkt. 25, at 4-5.

14        On April 4, 2013, the court issued an order requiring Z continue in out of home

15  placement.  Dkt. 26-2, at 15.  The order provided:

16      Ms. Biehner filed an ARY (and Z requested a CHINS) in order to access services
    however Ms. Biehner has refused DSHS' attempts to offer additional services

17      even though Ms. Biehner has told the Court that the services she has in place "are
    not working" and that Z beats her on a regular basis; Z reports he feels unsafe in

18      his mother's home due to her unpredictable anger  . . . Ms. Biehner and the school
    have told the court that Z takes no responsibility/blame for his actions/behaviors

19      and places fault with all others but himself – the Court finds that Ms. Biehner
    behaves this way as well; . . . the Court is concerned as to what happens behind

20      closed doors of the family home . . . the escalating episodes of violence (Z's
    having two assault charges for allegedly assaulting Ms. Biehner) and the

21      increasing law enforcement contacts with the family add to the Court's concern in
    considering in-home placement and the safety to its family members . . . the Court

22      finds that the family home environment is far too volatile at this time for in-home
    placement of Z for both Z and Ms. Biehner's safety.

23

24

1    Dkt. 26-2, at 16.  The court noted that "there was considerable testimony that Z is not a reliable

2    reporter about events at home and school and thus his credibility is doubtful."  Dkt. 26-2, at 16.

3    The court found that "the Sumner School District and Sumner Middle School (Connections

4    Program) are meeting Z's educational needs.  Stability and structure are needed for Z and it is in

5    his best interest to remain in this school."  Dkt. 26-2, at 17.  The court denied placement with Z's

6    maternal grandmother because she resided out of this school's district.  Dkt. 26-2, at 16-17.  The

7    order also provided that DSHS "is responsible for coordinating the student's

8    educational/therapeutic/medical /dental information and programming and Ms. Biehner shall not

9    interfere with these efforts.  Both parties [were ordered to] timely give notice to the other of all

10   scheduled appointments."  Dkt. 26-2, at 17.

11        On April 5, 2013, Plaintiff's counsel filed a Motion for Review Hearing in the

12   dependency action.  *Dependency of Z, D.O.B. 2/11/99*, Pierce County, Washington Superior

13   Court, Juvenile Court Division number 13-7-00675-1; filed in this case at Dkt. 26-2, at 24.  In

14   this motion, Plaintiff notified the Court that Z had been placed in a Snohomish County group

15   home, was not attending Sumner Middle School, had missed mental health and therapy

16   appointments, and that the DSHS staff had not informed Plaintiff of the medical examination that

17   was done on April 1. Dkt. 26-3, at 1-4.  Plaintiff argued that the court should return Z to her

18   care.  *Id.*  Z was ordered back into his mother's care on April 11, 2013, pending further hearing.

19   Dkt. 26-3, at 14.

20        On April 12, 2013, Z was placed in the home of his maternal grandmother, who resides in

21   Snohomish County.  Dkt. 25, at 5.  His grandmother enrolled him in a school, got him mental

22   and other health care.  Dkt. 25, at 5-6.

23        Plaintiff filed this case on June 20, 2013.  Dkt. 1.

24

ORDER ON MOTION FOR SUMMARY
JUDGMENT- 8

1    In the pending motion, Defendants argue that Plaintiff's claims should be dismissed because

2    the state and individual defendants in their official capacities are entitled to Eleventh

3    Amendment immunity, the individual defendants are absolutely immune, and are also entitled to

4    qualified immunity.  Defendants also move for dismissal of plaintiff's state law claim of

5    negligent investigation.  Dkts. 23 and 27.  Plaintiff opposes the motion.  Dkt. 26.  The motion is

6    ripe for decision.

7                          **II.**      **DISCUSSION**

8    **A.  SUMMARY JUDGMENT STANDARD**

9    Summary judgment is proper only if the pleadings, the discovery and disclosure materials

10   on file, and any affidavits show that there is no genuine issue as to any material fact and that the

11   movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c). The moving party is

12   entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient

13   showing on an essential element of a claim in the case on which the nonmoving party has the

14   burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).  There is no genuine issue

15   of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find

16   for the non moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

17   (1986)(nonmoving party must present specific, significant probative evidence, not simply "some

18   metaphysical doubt.").  *See also* Fed. R. Civ. P. 56(e).  Conversely, a genuine dispute over a

19   material fact exists if there is sufficient evidence supporting the claimed factual dispute,

20   requiring a judge or jury to resolve the differing versions of the truth.  *Anderson v. Liberty*

21   *Lobby, Inc.*, 477 .S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors*

22   *Association*, 809 F.2d 626, 630 (9th Cir. 1987).

23   The determination of the existence of a material fact is often a close question.  The court

24

1   must consider the substantive evidentiary burden that the nonmoving party must meet at trial –

2   e.g., a preponderance of the evidence in most civil cases.  *Anderson*, 477 U.S. at 254, *T.W. Elect.*

3   *Service Inc.*, 809 F.2d at 630.  The court must resolve any factual issues of controversy in favor

4   of the nonmoving party only when the facts specifically attested by that party contradict facts

5   specifically attested by the moving party.  The nonmoving party may not merely state that it will

6   discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial

7   to support the claim.  *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*).

8   Conclusory, non specific statements in affidavits are not sufficient, and "missing facts" will not

9   be "presumed."  *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

10          **B.  ELEVENTH AMENDMENT IMMUNITY**

11          The Eleventh Amendment to the United States Constitution bars a person from suing a

12   state in federal court without the state's consent.  *See Seminole Tribe of Florida v. Florida* 116

13   S.Ct. 1114, 1131 (1996); *Natural Resources Defense Council v. California Dep't of*

14   *Transportation*, 96 F.3d 420, 421  (9th Cir. 1996).  Eleventh Amendment immunity extends to

15   state agencies.  *Pennhurst State Sch. & Hosp. v. Holdeman*, 465 U.S. 89, 101-102(1984).

16   Eleventh Amendment immunity is not automatically waived in actions brought under 42 U.S.C.

17   § 1983.  *Quern v. Jordan*, 440 U.S. 332 (1979).

18          DSHS has not waived the protection of the Eleventh Amendment.  *Edgar v. State*, 92

19   Wn.2d 217 (1979).  Defendants' motion should be granted and Plaintiff's claims against DSHS

20   should be dismissed.

21          Further, neither states nor state officials acting in their official capacities are persons for

22   purposes of 42 U.S.C. § 1983.  *Will v. Michigan Dept. of State Police*, 491 U.S. 48, 71 (1989).

23   Because they are not persons within the meaning of § 1983, Plaintiff's claims against the any of

24

1   the named individuals acting in their official capacities should be dismissed.

2       **C.  ABSOLUTE IMMUNITY**

3       "Absolute immunity is extended to state officials, such as social workers, when they are

4   performing quasi-prosecutorial and quasi-judicial functions." *Tamas v. Department of Social &*

5   *Health Services*, 630 F.3d 833 (9th Cir. 2010) (*citing Caldwell v. LeFaver*, 928 F.2d 331, 333

6   (9th Cir. 1991)(naming advocacy to the decisionmaker and execution of a court order as

7   examples)).  "Social workers are not afforded absolute immunity for their investigatory conduct,

8   discretionary decisions or recommendations," however.  *Id.*

9       To the extent that Plaintiff brings claims against Defendants for the "discretionary quasi-

10  prosecutorial decisions to institute state court proceedings to take custody away" from Plaintiff,

11  Plaintiff's claims should be dismissed.  *Beltran v. Santa Clara County,* 514 F.3d 906, 908 (9th

12  Cir. 2008).  Defendants are entitled to absolute immunity.  *Id.*

13      To the extent that Plaintiff asserts that Defendants made false statements in the

14  dependency petition, the Defendants are not entitled to absolute immunity, and the claim will be

15  further analyzed below under Defendants' claim for qualified immunity.

16      **D.  QUALIFIED IMMUNITY**

17      In order to state a claim under 42 U.S.C. § 1983, a complaint must allege that (1) the

18  conduct complained of was committed by a person acting under color of state law, and that (2)

19  the conduct deprived a person of a right, privilege, or immunity secured by the Constitution or

20  laws of the United States.  *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled on other*

21  *grounds, Daniels v. Williams*, 474 U.S. 327 (1986).  Section 1983 is the appropriate avenue to

22  remedy an alleged wrong only if both of these elements are present.  *Haygood v. Younger*, 769

23  F.2d 1350, 1354 (9th Cir. 1985), *cert. denied*, 478 U.S. 1020 (1986).

24

1    In order to state a claim under 42 U.S.C. § 1983, a plaintiff must set forth the specific

2    factual bases upon which she claims each defendant is liable.  *Aldabe v. Aldabe*, 616 F.2d 1089,

3    1092 (9th Cir. 1980).  Vague and conclusory allegations of official participation in a civil rights

4    violations are not sufficient to support a claim under § 1983.  *Ivey v. Board of Regents*, 673 F.2d

5    266 (9th Cir. 1982).

6    Defendants in a Section 1983 action are entitled to qualified immunity from damages for

7    civil liability if their conduct does not violate clearly established statutory or constitutional rights

8    of which a reasonable person would have known.  *Pearson v. Callahan*, 129 S.Ct. 808, 815

9    (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified immunity balances

10    two important interests: the need to hold public officials accountable when they exercise power

11    irresponsibly and the need to shield officials from harassment, distraction, and liability when

12    they perform their duties reasonably. *Harlow v. Fitzgerald*, 457 U.S. at 815. The existence of

13    qualified immunity generally turns on the objective reasonableness of the actions, without regard

14    to the knowledge or subjective intent of the particular official. *Id*. at 819. Whether a reasonable

15    officer could have believed his or her conduct was proper is a question of law for the court and

16    should be determined at the earliest possible point in the litigation. *Act Up!/Portland v. Bagley*,

17    988 F.2d 868, 872-73 (9th Cir. 1993).

18    In analyzing a qualified immunity defense, the Court must determine: (1) whether a

19    constitutional right would have been violated on the facts alleged, taken in the light most

20    favorable to the party asserting the injury; and (2) whether the right was clearly established when

21    viewed in the specific context of the case. *Saucier v. Katz*, 121 S.Ct. 2151, 2156 (2001).  "The

22    relevant dispositive inquiry in determining whether a right is clearly established is whether it

23    would be clear to a reasonable officer that his conduct was unlawful in the situation he

24

confronted." *Id*.  While the sequence set forth in *Saucier* is often appropriate, it should no longer be regarded as mandatory.  *Pearson v. Callahan*, at 129 S.Ct at 811.  "The judges of ... the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Id*.

The privilege of qualified immunity is an immunity from suit rather than a mere defense to liability, and like absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.  *Saucier v. Katz*, 121 S.Ct. at 2156.

### 1.  Violation of Constitutional Right?

Plaintiff has failed to identify which constitutional right Defendants allegedly violated. Plaintiff's unverified Complaint merely says that Defendants "violated the constitution rights of Veronica Biehner."  Dkt. 1, at 4.  Plaintiff's Response also fails to address the question.  Her "constitutional" claim should be dismissed on this basis.  Further, to the extent that Plaintiff makes a claim under the due process clause of the Fourteenth Amendment, her claim should be dismissed.

"Substantive due process protects individuals from arbitrary deprivation of their liberty by government."  *Costanich v. Department of Social and Health Services*, 627 F.3d 1101, 1110 (9th Cir. 2010) (*quoting Brittain v. Hansen*, 451 F.3d 982, 991 (9th Cir.2006).  The substantive due process clause also protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children.  *Troxel v. Grandville,* 530 U.S. 57, 64 (2000). While a parent's constitutional liberty interest in the maintenance of the familial relationship exists, this right is not absolute.  *Woodrum v. Woodward County,* 866 F.2d 1121, 1125 (9th Cir. 1989).  The interest of the parents must be balanced against the interests of the state in protecting

1   the child.  *Id*.

2        Plaintiff argues that "the allegation in the complaint is that Defendant Kate Orlando made

3   not only false statements, but also incomplete and inaccurate statements, in a dependency

4   petition that was signed under penalty of perjury. . ."  Dkt. 26, at 5.  Plaintiff, however, fails to

5   provide any evidence to support her allegation.  Her assertions in the pleadings (the unverified

6   Complaint and Response to the Motion for Summary Judgment) do not meet her burden under

7   Rule 56.

8        Moreover, Plaintiff fails to point to any authority that Defendants failure to house Z in

9   Pierce County, get Z to his school or health care provider appointments in the week or so period

10  after the shelter care hearing and the time when he entered his maternal grandmother's care

11  violated Plaintiff's constitutional rights.  Her claim should be dismissed.

12            2.  *Clearly Established?*

13       Plaintiff has failed to point to any evidence that her constitutional rights have been

14  violated.  No further analysis is required.  *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1060

15  (9th Cir. 2006).  Defendants are entitled to qualified immunity on Plaintiff's constitutional

16  claims.

17  **E.  STATE LAW CLAIM FOR NEGLIGENT INVESTIGATION**

18       Washington courts recognize a claim for negligent investigation of child abuse

19  allegations under RCW 26.44, *et. seq.  Roberson v. Perez*, 156 Wn.2d 33, 44–45 (2005).

20  Negligent investigation claims are "cognizable only when DSHS conducts a biased or faulty

21  investigation that leads to a harmful placement decision, such as placing a child in an abusive

22  home, removing the child from a nonabusive home, or failing to remove the child from an

23  abusive home."  *Id.,* at 45.

24

ORDER ON MOTION FOR SUMMARY
JUDGMENT- 14

1    Plaintiff's claim for negligent investigation should be dismissed.  Plaintiff has failed to

2    point to any evidence that DSHS conducted a "biased or faulty investigation."  *Roberson,* at 45.

3    Further, she has made no showing that the investigation led to a "harmful placement decision."

4    *Id.*

5                              **III.    ORDER**

6        Therefore, it is hereby **ORDERED** that:

7        • Defendants' Motion for Summary Judgment (Dkt. 23) is **GRANTED**; and

8        • This case is **DISMISSED**.

9        The Clerk is directed to send uncertified copies of this Order to all counsel of record and

10   to any party appearing *pro se* at said party's last known address.

11       Dated this 22nd day of May, 2014.

12

13                         *Robert J Bryan*

14                         ROBERT J. BRYAN
                           United States District Judge

15

16

17

18

19

20

21

22

23

24

ORDER ON MOTION FOR SUMMARY
JUDGMENT- 15